UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-20899-CIV-MORENO
MAGISTRATE JUDGE PATRICK A. WHITE

TYWEE DWAYNE HURD,                  :

            Plaintiff,              :

v.                                  :              REPORT OF
                                           MAGISTRATE JUDGE
SGT. DURRAND, et al.,               :

            Defendants.             :
_____     :

## I.  **INTRODUCTION**

Plaintiff Tywee Dwayne Hurd has filed a pro se civil rights complaint, pursuant to 42 U.S.C. §1983 (DE#1), concerning events which occurred in August and September of 2010 when he was a pretrial detainee at the Miami-Dade County Jail ("MDCJ"). The Court notes that Hurd is no longer in pretrial detention at MDCJ. He is now a prisoner committed to the Florida DOC. In the complaint Hurd listed Everglades CI ("ECI") as his address (DE#1 p.3), but he was transferred to Dade C.I. in July 2012 (DE#36). Public records pertaining to Hurd indicate he has been in Florida DOC custody since 11/14/11;[1] and his complaint, which was mailed from ECI on 3/1/12 (see DE#1 p.9)[2] therefore was filed with this Court some 3 months and 16 days after his transfer from the MDCJ to the Florida DOC.

In the complaint, Hurd named four MDCJ employees as defendants, identifying them as follows: Sgt. Durant; Cpl. Wilson; and Officers Freezer and Carter. Summonses were issued (DE#s 10-13), the defendants were personally served, and the Returns of Service

---

[1]    Records pertaining to Hurd, which are maintained and published as a matter of public record by the Florida DOC, indicate that he is currently at ECI, and that he has been in Department custody since 11/14/11. (See "Inmate Population Information Detail," under "Corrections Offender Network," on the Department's website at www.dc.state.fl.us).

[2]    The pleading is stamped "Received MAR 01 2012 EVERGLADES C.I." (DE#1 p.9) and was docketed by the Clerk on 3/5/12 (DE#1 p.1). The date of filing by the Clerk of Court is not considered the "filing date." Rather, the Courts have held that a pro se prisoners' civil rights filings are considered "filed" on the date they are tendered to prison authorities for mailing, see Garvey v. Vaughn, 993 F.2d 776 (11 Cir. 1993); Houston v. Lack, 487 U.S. 266 (1988).

show that their correct titles and names are: Sgt. Sophia Durand (DE#15); Sgt. Marlon Wilson (DE#24); Officer Jean Frezin (DE#19); and Officer Dionne Carter (DE#23). A Preliminary Report (DE#5) recommended that the case be allowed to proceed against Durand for indifference to Hurd's medical (psychiatric) needs, and proceed against all four defendants on claims of use of force. (DE#1, p.8).

   **This Cause is before the Court upon Defendants' joint Motion to Dismiss pursuant to <u>Fed.R.Civ.P.</u> 12(b)(6) (DE#28), with supporting exhibits (DE#28-1).** Plaintiff filed a Response (DE#30), and the defendants filed a Reply (DE#31). As discussed further, below, the thrust of the defendants' motion is their argument that, as to both his medical indifference claims and his use of force claims, the plaintiff did not exhaust his available administrative remedies before bringing suit under §1983, and that his complaint is therefore subject to dismissal under the Prison Litigation Reform Act of 1995 ("PLRA"), pursuant to 42 U.S.C. §1997e(a). Alternatively, the defendants contend that the use of force claims should be dismissed for failure to state a cause of action, on the ground that the use of force alleged was *de mimimis* and is not claimed to have caused any sort of physical injury.

### II   <u>LAW PERTAINING TO THE PLRA EXHAUSTION REQUIREMENT</u>

   In relevant part, Section 1997e provides, as follows:

> ...No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. §1997e(a).

   Exhaustion of all available administrative remedies is a mandatory pre-condition to suit. <u>Booth v. Churner</u>, 532 U.S. 731, 739 (2001); <u>see also Porter v. Nussle</u>, 534 U.S. 516, 524-25 (2002) ("Beyond doubt, Congress enacted §1997e(a) to reduce the quantity

2

and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.").[3]

The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. <u>Porter</u>, <u>supra</u>, 534 U.S. at 524. Exhaustion is required whether the plaintiff seeks declaratory and injunctive relief, monetary damages, or both. <u>Booth</u>, <u>supra</u>, 532 U.S. at 734. The requirement is not subject to waiver by a court, or futility or inadequacy exceptions. <u>See</u> <u>Booth</u>, <u>supra</u> at 741 n. 6 ("we will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise"); <u>Alexander v. Hawk</u>, 159 F.3d 1321, 1325-26 (11 Cir.1998)("Congress has now mandated exhaustion in section 1997e(a) and there is no longer discretion to waive the exhaustion requirement...Since exhaustion is now a pre-condition to suit, the courts cannot simply waive those requirements where the determine they are futile or inadequate."). Moreover, the PLRA requires "proper exhaustion," so that the agency has an opportunity to address the issues on the merits. <u>Woodford v. Ngo</u>, 548 U.S. 81, 87-88 (2006); <u>see</u> <u>also</u> <u>Woodford</u>, <u>supra</u>, 548 U.S. at 95 ("The

---

[3]     The Eleventh Circuit has articulated the following policy reasons for favoring the exhaustion requirement:

> (1) to avoid premature interruption of the administrative process; (2) to let the agency develop the necessary factual background upon which decisions should be based; (3) to permit the agency to exercise its discretion or apply its expertise; (4) to improve the efficiency of the administrative process; (5) to conserve scarce judicial resources, since the complaining party may be successful in vindicating rights in the administrative process and the courts may never have to intervene; (6) to give the agency a chance to discover and correct its own errors; and (7) to avoid the possibility that frequent and deliberate flouting of the administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures.

<u>Alexander v. Hawk</u>, 159 F.3d 1321, 1327 (11 Cir.1998).

benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules.").

The Supreme Court further explained that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules [prior to seeking relief from a federal court] because no adjudicative system can function effectively without imposing some orderly structure on the courts of its proceedings... Construing §1997e(a) to require proper exhaustion ... fits with the general scheme of the PLRA, whereas [a contrary] interpretation [allowing an inmate to bring suit in federal court once administrative remedies are no longer available] would turn that provision into a largely useless appendage." Woodford, supra, at 89. This interpretation of the PLRA's exhaustion requirement "carries a sanction" for noncompliance and avoids "mak[ing] the PLRA exhaustion scheme wholly ineffective." Id. at 91. Consequently, a prisoner cannot "proceed...to federal court" after bypassing available administrative remedies, either by failing to properly exhaust administrative remedies or waiting until such remedies are no longer available, as allowing federal review under these circumstances would impose "no significant sanction" on the prisoner and "the PLRA did not create such a toothless scheme." Id.

A court must dismiss an action if satisfied that the plaintiff failed to properly exhaust his available administrative remedies prior to filing suit. Higginbottom v. Carter, 223 F.3d 1259, 1261 (11 Cir.2000); Alexander, supra, 159 F.3d at 1325-26.

In an instance where an inmate did not timely pursue a grievance or grievance appeal, he/she cannot then simply bypass the administrative grievance procedure, and proceed to federal district

court and seek relief on his/her underlying claim(s) without having sought to file a grievance, or grievance appeal, out-of-time. See Harper v. Jenkin, 179 F.3d 1311, 1312 (11 Cir.1999) (rejecting plaintiff's argument that his administrative remedies should be deemed exhausted since his grievance was denied as untimely and any appeal therefrom would necessarily be denied; and affirming dismissal of civil rights suit for failure to satisfy mandatory exhaustion requirements, and in doing so holding that the appellant could not be considered to have exhausted his administrative remedies where he had not sought leave to file an out-of-time grievance, since to find otherwise would allow an appellant to simply ignore the PLRA's exhaustion requirement and still gain access to federal court merely by filing an untimely grievance).

Further, in instances where an inmate/plaintiff contends that there existed some impediment to his/her filing of a grievance, or grievance appeal, Courts have held that when such an impediment to exhaustion is removed, an inmate's failure to properly utilize administrative remedies thereafter cannot be justified. See Hilton v. Sec'y for Dep't of Corr., No. 03-13492, 170 Fed. Appx. 600, 605, 2005 WL 3802979, at **5 (11 Cir., Nov. 1, 2005)(in case where a state prisoner alleged that he could not exhaust administrative remedies because he was denied grievance forms while in "administrative confinement," the Eleventh Circuit explained that "Hilton's contention...[did] not entitle him to relief because he fail[ed] to allege that he was unable to obtain these forms once he was released from confinement"); Mason v. Smith, No. CV304-19, 2007 WL 2386411, at *6-7 (S.D.Ga., Aug. 17, 2007) (in case where plaintiff contended he was in lock-down following a use of force incident and contended that he therefore was unable to file a grievance within the five (5) day time period required by the SOP, the court found that even if, assuming arguendo, the plaintiff was prevented from pursuing administrative remedies within the initial five-day period, his failure to pursue an out-of-time grievance after he was

released form confinement had access to the grievance process, required the Court to dismiss the instant suit under §1997e(a)).

Finally, it is noted that while pre-suit exhaustion of administrative remedies is mandatory, Jones v. Bock, 549 U.S. 199, 211 (2007), in limited circumstances an inmate's administrative remedies may be deemed to have been rendered "unavailable," but the Plaintiff "must point to specific facts showing that officials prohibited or blocked his use of the grievance process." Heard v. Allen, No. 1:09-CV-119 (WLS), 2010 WL 3855235, at *4 (M.D.Ga., Aug. 12, 2010). Courts have found that such circumstances may include refusal of forms needed to pursue an institution's established grievance process; informing an inmate that a procedural step in the established administrative process need not or cannnot be pursued; or threats of retaliation of a sufficient nature. See e.g. Miller v. Norris, 247 F.3d 736, 740 (8 Cir. 2001) (holding that inmate was prevented from exhausting his administrative remedies when prison officials failed to respond to his requests for grievance forms, and that the inmate's failure to exhaust those remedies was not a bar to suit because they were not "available" to him); Miller v. Tanner, 196 F.3d 1190, 1194 (11 Cir.1999) (inmate was not required to file an appeal after being told unequivocally, and in writing, that appeal was precluded; plaintiff produced memorandum denying grievance and informing plaintiff that no appeal was available); Mosier v. Fla. Dept. of Corr., No. 5:11-cv-399-MP-GRJ, 2012 WL 3239385, at *4 (N.D.Fla., June 19, 2012) (An administrative remedy may be deemed "unavailable for PLRA purposes if prison officials render pursuit of the remedy irrational through threats of substantial retaliation."); Cole v. Sec'y Dept. of Corr., No. 11-10691, 451 Fed.Appx. 827, 828, 2011 WL 6184433, at **1 (11 Cir., Dec. 14, 2011)(To demonstrate such unavailability as a result of threats, a prisoner must establish that: (1) the threat actually deterred him from lodging a grievance or pursuing a particular part of the administrative process; and (2) the threat is one that would so deter a reasonable inmate of ordinary firmness and fortitude)

(citing <u>Turner v. Burnside</u>, 541 F.3d 1077, 1084-1085 (11 Cir.2008)).


### III   THE CURRENT POSTURE OF THIS CASE, AND
### APPLICABLE STANDARD OF REVIEW
### FOR CONSIDERATION OF LACK OF EXHAUSTION DEFENSE

Ordinarily, in a <u>pro se</u> §1983 civil rights action such as this, if defendants file a Rule 12(b)(6) motion to dismiss with supporting exhibits, which constitute matters outside the pleadings, and the exhibits are not excluded from consideration, the motion to dismiss is converted to a motion for summary judgment. <u>See</u> <u>Fed.R.Civ.P.</u> 56 and 12(d). In such cases, or cases where defendants file a Motion for Summary Judgment pursuant to <u>Fed.R.Civ.P.</u> 56, it is customary that the plaintiff, as a *pro se* litigant, through issuance of a standard "Order Instructing Pro Se Plaintiff Concerning Response to Motion for Summary Judgment," be given notice of his right to respond to a defense motion for summary judgment. This is done to inform the plaintiff, as a *pro se* non-Movant, of his right to oppose a defense Rule 56 motion, and in order to instruct the *pro se* plaintiff of the requirements under Rule 56 for a proper response to such a motion. <u>See</u> <u>Brown v. Shinbaum</u>, 828 F.2d 707 (11 Cir.1987)(vacating a grant of summary judgment, where notice to a *pro se* plaintiff was inadequate because it did not properly inform him of consequences of default, did not specify his evidence must in the form of sworn affidavits, and did not satisfy a ten-day notice requirement).[4]   In this case, upon the

---

[4]     Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper

[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

In <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), the Court held that

summary judgment should be entered only against

> a party who fails to make a showing sufficient to establish the
> existence of an element essential to that party's case, and on which
> that party will bear the burden of proof at trial.  In such a
> situation, there can be 'no genuine issue as to any material fact,'
> since a complete failure of proof concerning an essential element of
> the non-moving party's case necessarily renders all other facts
> immaterial. The moving party is 'entitled to judgment as a matter of
> law' because the non-moving party has failed to make a sufficient
> showing on an essential element of her case with respect to which
> she has the burden of proof.  (citations omitted)

Thus, in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against a party who fails to make a show-ing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.  The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted). Thus, pursuant to Celotex and its progeny, a movant for summary judgment bears the initial re-sponsibility of informing the court of the basis for his motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. Hoffman v. Allied Corp., 912 F.2d 1379, 1382 (11 Cir.1990).If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genu-ine issue of material fact, the burden then shifts to the nonmoving party, to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11 Cir.), cert. denied, 112 S.Ct. 913 (1992). It is the nonmoving party's burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. Earley v. Champion International Corp., 907 F.2d 1077, 1080 11 Cir.1990). The non-moving party cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial Fed.R.Civ.P. 56(e); Coleman v. Smith, 828 F.2d 714, 717 (11 Cir.1987). If the evidence pre-sented by the nonmoving party is merely colorable, or is not significantly proba-tive, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Baldwin County, Alabama v. Purcell Corp., 971 F.2d 1558 (11 Cir.1992). "A mere 'scintilla' of evidence supporting the opposing party's posi-tion will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11 Cir. 1990) (citing Anderson v. Liberty Lobby, Inc., supra).

In this Court, pursuant to Brown v. Shinbaum, 828 F.2d 707 (11 Cir. 1987), an Order of Instructions to Pro Se Plaintiff Concerning Response to Motion for

defendants' filing of their joint Rule 12(b)(6) motion, with supporting exhibits, such a standard Order of Instructions was entered and sent to Plaintiff Hurd. (See Order, DE#29).

Further scrutiny of the defendants' motion (DE#28) reveals, however, that they have raised lack of exhaustion as a defense.

The Supreme Court has held that failure to exhaust is an affirmative defense under the PLRA, and inmates are not required to specially plead or demonstrate exhaustion in their complaints. Jones v. Bock, 549 U.S. 199, 216 (2007). The Eleventh Circuit has held that a defense of failure to properly exhaust available administrative remedies under the PLRA should be treated as a matter in abatement, Bryant v. Rich, 530 F.3d 1368, 1374 (11 Cir.2008), meaning that procedurally the defense is treated "like a defense for lack of exhaustion," although it is not a jurisdictional matter.[5] Bryant, supra, 530 F.3d at 1374.

Thus, due to the defendants' assertion of the affirmative defense of lack of exhaustion, in this case, despite their inclusion of exhibits with their motion to dismiss, it is not necessary or proper to convert the Rule 12(b)(6) motion to one sounding under Rule 56, and then, by use of the summary judgment procedural framework, engage in analysis of the question whether the plaintiff/non-movant has exhausted his administrative remedies. See Myles v. Miami-Dade County Correctional and Rehabilitation Dept., et al., No. 11-14775, 476 Fed.Appx. 364, 366, 2012 WL 1368164, at *1-2 (11 Cir., April 19, 2012)(noting that the question of exhaustion under

---

Summary Judgment is routinely entered to inform a *pro se* plaintiff of his right to respond to a defendant's motion for summary judgment, or motion to dismiss treated as one for summary judgment, and to instruct the plaintiff regarding requirements under Fed.R.Civ.P. 56 for a proper response to such a motion.

[5] The Supreme Court has confirmed that exhaustion under the PLRA is not a jurisdictional prerequisite. See Woodford v. Ngo, 548 U.S. 81, 101 (2006)(stating that it is "clear that the PLRA exhaustion requirement is not jurisdictional.").

the PLRA, raised as a defense, is a "threshold matter" which the court must address before considering merits of the case, and holding that use of the summary judgment procedural framework is inappropriate for consideration of whether the inmate plaintiff's administrative remedies were properly exhausted); Bryant v. Rich, 530 F.3d 1368, 1375 (11 Cir.2008)(the exhaustion defense "is not ordinarily the proper subject for a summary judgment; instead it 'should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment.'")(quoting Ritza v. Int'l Longshoremen's & Warehousemen's Union, 837 F.2d 365, 368-69 (9 Cir. 1988)).

When deciding whether a prisoner has exhausted his/her remedies, and the matter is raised as a defense, the court should first consider the plaintiff's and the defendants' versions of the facts [looking at the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response], and if they conflict, the court should take the plaintiff's version of the facts as true, and "[i]f in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed." Turner v. Burnside, 541 F.3d 1077, 1082 (11 Cir.2008)(citing Bryant, supra, 530 F.3d at 1373-74; Myles, supra, 2012 WL 1368164, at *2. If, however, the complaint is not subject to dismissal at that first step, where the plaintiff's allegations are assumed to be true, the court should then proceed "to make specific findings in order to resolve the disputed factual issues related to exhaustion." Turner, supra, 541 F.3d at 1082 (citing Bryant, supra, 530 F.3d at 1373-74); Myles, supra.

### IV   PLAINTIFF'S CLAIMS, AND DEFENDANTS' ASSERTED ARGUMENTS/DEFENSES

As discussed in the Preliminary Report, the gravamen of the complaint is two-fold: (1) alleged indifference by Defendant Durand to Hurd's serious medical (psychiatric) needs on 2 separate occasions on 8/9/10 [the first followed by Hurd's alleged self-

10

infliction of a cut on his shoulder on 8/9/10; and the second allegedly followed by a hanging attempt on 9/9/10]; and (2) alleged use of physical force accompanied by verbal abuse, twice on 8/9/10, involving all 4 Defendants (Durand, Wilson, Frezin, and Carter) [the first when they walked plaintiff Hurd to Medical/Psych from the 10th Floor after he allegedly cut his shoulder on 8/9/10; and the second time when they returned him from Medical/Psych to the 10th Floor on 8/9/10]. In the Preliminary Report, Plaintiff Hurd's factual allegations were summarized, as follows:

> Plaintiff was placed in administrative confinement at the Miami-Dade County Jail. Upon arrival, he was "roughed up" because he was rumored to be a "masturbator." At this time, Plaintiff was already under a lot of stress, because he disputed the reasons for his confinement. Plaintiff therefore asked Sgt. Durant to allow him to speak to a psychiatrist regarding his mental issues. Sgt. Durant refused. Being under that amount of stress, Plaintiff then attempted suicide by cutting himself on the shoulder.

> The floor sergeant saw Plaintiff's self-inflicted injury. She therefore "pulled" Plaintiff from administrative confinement so that he could be taken to "psych." Sgt. Durant, Cpl. Wilson, Ofc. Freezer and Ofc. Carter arrived to escort Plaintiff for medical treatment. They handcuffed Plaintiff and, instead of taking the elevator, took him down the stairs. Once in the stairwell, Sgt. Durant pushed Plaintiff's head repeatedly while making statements such as "you'll want to jack off on a female officer and come to confinement and cry." Cpl. Wilson and Ofc. Freezer held Plaintiff's arms, which were cuffed behind his back, so that he could not move. Ofc. Carter stood at the door and acted as the look-out.

> After this, Plaintiff was seen by a doctor. The doctor told Sgt. Durant to place Plaintiff on suicide watch in the psychiatric wing on the 9th floor. In response, Sgt. Durant stated "he is going to strip on 10." Sgt. Durant then aggressively grabbed the injured Plaintiff and dragged him out of his chair. Plaintiff was then again taken to the 10th floor through the same stairwell, and abused by the same officers in the same manner as before.

Plaintiff was already going through a difficult time be-
fore this incident. The incident made his mental, physical and
emotional pain worse. Later that day, Plaintiff attempted
suicide  by hanging, and was finally placed on suicide watch
in the psychiatric wing on the 9th floor.

After arriving on the 9th floor, Plaintiff reported the
abuse he had suffered to Lt. Combs. Lt. Combs' response was
"you lucky I wasn't up there cause I probably would've beat
your ass too." Upon hearing this, Plaintiff by-passed the
grievance process for fear of retaliation by the corrections
officers.

(Preliminary Report, DE#5, pp.4-5).

In recommending that the complaint be allowed to go forward
against defendant Durand on the claim of deliberate indifference to
serious medical needs, the relevant fact allegations were
summarized in the Preliminary Report, as follows:

Here, Plaintiff alleges that he was suffering from significant
stress and communicated his need for a psychiatric consulta-
tion to Sgt. Durant, but that Sgt. Durant refused. Plaintiff
further alleges that, as a result, he cut himself on the
shoulder.[6] Plaintiff also alleges that, after he cut himself

---

[6]     For purposes of this Report, it should be noted that the defendants
have construed certain of Plaintiff Hurd's allegations as being raised against
an "unknown officer," while the court in its Preliminary Report construed
those allegations as being raised against Sgt. Durand. [They concern August 9th when
Hurd claims that he told an officer he was under stress and wanted to see the
psychiatrist, that the officer allegedly refused the request, and that he [Hurd]
then cut himself on the shoulder, in a first attempt to commit suicide].

The relevant sentence in the Complaint (DE#1 at p.5) containing Hurd's
allegation reads: "On or around 8-9-10, I was going through a lot of stress for
being placed in confinement for false alleghtion *and I asked On[e] of the Ofc.
to speak to a psych doctor at which time I was refused, being under that amount
of stress I attempted suicide by cutting myself on my left shoulder*" *[Emphasis
Added].* (See Complaint, DE#1 p.6). The Court, in the Preliminary Report, however,
construed the Complaint as asserting that it was Defendant Durand who allegedly
refused Hurd's 8/9/10 request to see a psychiatrist. This is because the Court,
carefully reading the *pro se* pleading in its entirety, took note of Plaintiff
Hurd's statement, made elsewhere in the complaint (at DE#1 p.5), that it was Sgt.
Durand who ignored his request, thus [according to Hurd] allegedly leading to his

and the doctor told Sgt. Durant to place Plaintiff on suicide watch on the 9th floor, Sgt. Durant still refused. Plaintiff has thus stated a claim against Sgt. Durant for deliberate indifference to serious medical needs.

(Preliminary Report, DE#5, p.6).

In recommending that the complaint be allowed to go forward against all four Defendants, on the claim of Excessive Force, the relevant facts were summarized in the Preliminary Report, as alleging the following:

> Here, Plaintiff alleges that all four of the named defendants deliberately took Plaintiff into a stairwell while en route to and from needed medical treatment. Plaintiff further alleges that, at that time, he was injured and had his hands cuffed

---

act of self-mutilation [cutting his own shoulder]. (See Complaint, DE#1, pp.5 and 8, at §III captioned "Relief" -- in which Hurd states: "I'm asking this court to award plaintiff $50.000 from **Sgt Durant [sic] for Violating my 8th and 14th Amendment right when I asked Sgt. Durant to speak to Psych concerning my mental issues I was refused my right to see psych...**").

With regard to Hurd's claim against Sgt. Durand, for allegedly ignoring his psychiatric needs, the additional fact allegations underlying the claim that Sgt. Durand ignored a medical order from the Psychiatrist to place Hurd on suicide watch in a 9th Floor cell, and that that omission was followed later by a second alleged suicide attempt [apparently on September 9th] appear at pages 6-7 of the pleading. That portion of the complaint reads, as follows, *verbatim*:

> I was then walked to the (9th) Floor and taken to see the psych doctor. After I stated what my problem was the doctor (unknown) told Sgt.Durant to place me on "9C-Wing (Suicide Watch)," and Sgt. Durant stated while grabbing me aggressively under my arm, "He is going to Strip on (10),"... Before incident, I was already going through some stressful problems. And going through this made my problem, mental, physical, and emotional pain worse. Later that day I tried to commit suicide by hanging. And on the next shift (3-11) I was taked to PT 9C1 and placed on suicide watch for (8) days 9-9-10  -- 9-17-10.

(Complaint, DE#1 pp.6-7).

behind his back.[7] Plaintiff alleges that, while in the
stairwell, Cpl. Wilson and Ofc. Freezer held his arms so that
he could not move, while Sgt. Durant pushed his head
repeatedly and made disturbing statements. Finally, Plaintiff
alleges that, all the while, Ofc. Carter stood idle and acted
as a look-out by the door. Plaintiff has thus stated a claim
against Sgt. Durant, Cpl. Wilson, Ofc. Freezer and Ofc. Carter
for excessive force.

(Preliminary Report, DE#5, p.7).

As discussed, above, with regard to the question of whether or
not inmate/plaintiff Hurd, before bringing suit (i.e., filing his
§1983 complaint in this case), exhausted his administrative reme-
dies through the inmate grievance procedure established for use by
MDCJ detainees, the defendants [Durand, Wilson, Frezin, and Carter]
in their joint motion to dismiss assert that plaintiff Hurd did not
use the established grievance procedure to complain about any of
the four alleged deprivations at the jail.

In summary, the four alleged deprivations are:

DURAND'S alleged indifference to Hurd's medical/psychiatric needs
on two occasions:

     (1) by allegedly ignoring Hurd's statement (on 8/9/10) that he
     was stressed and wanted to speak to the psychiatrist, after
     which Hurd allegedly cut himself on the shoulder; and

     (2) by allegedly putting Hurd in a 10th floor strip cell after
     he was seen by a physician following the 8/9/10 shoulder-
     cutting incident, rather than placing him in a suicide watch
     cell on the MDCJ 9th Floor as Hurd claims the psychiatrist

---

[7]     This statement [that "Plaintiff further alleges that, at the time,
he was injured"] was a reference to plaintiff's allegation that he had a self-
inflicted cut on his shoulder. There is no allegation in the complaint of any
specific physical injuries sustained by Hurd as a result of being cuffed, his
arms being held [by Wilson and Frezin], or his head being pushed by Durand.

directed, [after which Hurd allegedly attempted to hang himself (on or about 9/9/10) and then was placed on suicide watch on the 9th Floor for 8 days (from 9/9 to 9/17/10)]; and

ALL FOUR DEFENDANTS' alleged participation in use of force against Hurd, on two occasions on 8/9/10, while escorting him in wrist restraints to and from Medical/Psych, via a staircase, after he allegedly cut his shoulder:

> (1) when, on the way to Medical/Psych, defendants Frezin and Wilson "held [his] arms," Carter was at a doorway "as a look out," and  defendant Durand allegedly "pushed [Hurd's] head repeatedly" while saying to him: "You'll want to jack off on Female Off[icer] and come to confinement and cry;" and

> (2) when being escorted from Medical/Psych after seeing an unknown doctor, he "again...was taken into the stairwell and again...was abused by Staff listed above and below."

Undisputedly, the Miami-Dade County Corrections and Rehabilitation Department ("MDCCRD") has a "D.S.O.P." [Departmental Standard Operating Procedure] establishing paramaters for the filing and handling of inmate complaints/grievances. This is the MDCCRD's D.S.O.P. No.15-001, captioned: "SUBJECT: INMATE COMPLAINT/GRIEVANCE PROCESS." An authenticated copy of the current version of DSOP 15-001 ("EFFECTIVE DATE: Date: August 27, 2007") -- the version which was in force when the events alleged in the instant complaint occurred -- appears in the record (see Defendants' Exhibits, DE#18-1, Ex.A, Ex.A-1). The current version of DSOP 15-001 superseded a prior version which was effective January 15, 1997. (See Id., Ex.A-1)

The Court notes that while the defendants submit as an exhibit the current version of D.S.O.P. No. 15-001 from August 27, 2007 (DE#18-1, Ex.A, Ex.A-1) which was effective when the alleged deprivations occurred in August and September of 2010, they mistakenly quote in the body of their Motion to Dismiss (at DE#28 pp.8-9) text

15

that is from the prior version of D.S.O.P. No. 15-001 from 1997, which was no longer in effect in 2010.[8]

Here, the defendants' quotation of language from the superseded 1997 version of DSOP 15-001 is not fatal to their Motion to Dismiss. This is because they have filed the <u>current</u> version of DSOP 15-001, and they rely upon the DSOP for its requirements that the inmate initiate a grievance, and thereafter take an appeal if dissatisfied with the resolution of the formal grievance.[6]

---

[8]     A Court may take judicial notice of its own records, and of public records within its own files. See <u>Cash Inn of Dade, Inc. v. Metropolitan Dade County</u>, 938 F.2d 1239 (11 Cir.1991) (district court may take judicial notice of public records within its files relating to particular case before it or to other related cases); <u>ITT Rayonier, Inc. v. U.S.</u>, 651 F.2d 343 (5 Cir.1981) (court may take judicial notice of its own records or of those of inferior courts); <u>Kinnett Dairies, Inc. v. Farrow</u>, 580 F.2d 1260 (5 Cir.1978) (trial court did not err in taking judicial notice of materials in court's own files from prior proceedings).
        Here, the Court observes (taking judicial notice of its own records) that an authenticated copy of the Dade Department of Corrections and Rehabilitation's D.S.O.P. 15-001 (SUBJECT: Inmate Grievance Procedure, Effective DATE: January 15, 1997) appears in this Court's official files/records in Case 02-cv-21597-PCH (at DE#55 pp.36-51, as Exs. 7 and 7A). That 1997 version of DSOP 15-001, although superseded, is itself a public record of Miami-Dade County; and the Exhibits 7 and 7A in Case 02-cv-21597-PCH, which are in and of themselves public records, appear on the CM/ECF docket maintained by the Clerk of Court, and as scanned documents may be viewed by the public.

[6]     Under the current version of the D.S.O.P. (Effective 8/27/07), MDCCRD inmates may pursue informal resolution of their complaint, and thereafter file a formal written grievance, followed by a written grievance appeal. The inmate has the option of first attempting to achieve an informal resolution of their complaint with staff. If, after an informal discussion, the matter is not informally resolved to the inmate's satisfaction, or if the inmate chooses to bypass the informal resolution, the next steps are to pursue a formal grievance, and thereafter an appeal. If an inmate has more than one complaint/grievance, each complaint/grievance must be submitted on a separate grievance form. As provided in the DSOP 15-001 and the Inmate Handbook outlining its use, there are established time frames for the inmate to initiate each stage of the grievance/appeal process, and for officials to respond. [The time limit for the inmate complaint/grievance process may be extended, but only for good cause or if agreed to by both the inmate and Facility Supervisor/Bureau Commander, CHS Nurse Manager or designee in writing. If an extension is not agreed upon, the inmate can exercise his/her right to the grievance appeal process]. If, at the outset, informal resolution is not sought or achieved, and the matter proceeds to the formal grievance stage, the inmate must request and obtain from staff a grievance form within 10 work days of the incident and submit the completed form

It is undisputed, as stated by the defendants in their Motion to Dismiss, that as to the alleged abuses to which Plaintiff Hurd claims the defendants subjected him, Hurd did not exhaust his available administrative remedies using the grievance procedures established by the MDCCRD's DSOP 15-001. This is because the plaintiff Hurd did not, in regard any of the incidents/deprivations alleged in this case, file any grievances or grievance appeals as provided for under DSOP 15-001.

As discussed/noted above, the plaintiff himself readily admits in his complaint (DE#1) and Response (DE#30) that in regard to the alleged deprivations [2 instances of indifference by Defendant Durand to his psychiatric needs on 8/9/10; and two instances of use of force on 8/9/10 involving all 4 Defendants] he did not make use of the inmate grievance process established under DSOP 15-001, and he instead chose to write a complaint to "Internal Affairs."

More specifically, Plaintiff Hurd states that on or about 9/13/10, while he was on suicide watch [from 9/9 to 9/17/10] on floor/unit 9C1, in Cell #9, he "reported the staff abuse to Correction Ofc. Lieutenant Combs." (DE#1 p.7). Plaintiff alleges that Combs commented "You probably deserved it." Plaintiff Hurd asserts that when Lt. Combs questioned him further about the alleged abuse ("He asked me why?") he [Hurd] told Combs that "Sgt. Durrant [sic] hit me because she stated 'you want to jack off on officers and get

---

to a Correctional Counselor within 2 workdays. If the inmate is not satisfied with/does not accept the response to the formal grievance which is provided by a facility Supervisor, Bureau Commander, CHS Nurse Manager, or designee, he/she must initiate the appeal process by requesting an Inmate Grievance Appeal form within 2 work days of receipt of the response, indicating on the form that he/she wishes to appeal, and within 2 work days of the grievance response submitting the completed grievance appeal form for review by a Division Chief or Director of Patient Care Services, who will make a final decision. The DSOP also provides for extension of the time limitation on grievance appeals, but only if agreed to in writing by the inmate and the Division Chief or the Director of Patient Care Services. If a grievance is not resolved before an inmate's release, the form is sent to the Grievance Clerk and RSB Supervisor determines if it is to be continued on the inmate's behalf, even where he is not present to sign forms.

to conf[inement] and cry,'" and Lt. Combs allegedly responded, "You lucky I wasn't up there cause I probably would've beat your ass too." (DE#1, p.7). Finally, Plaintiff Hurd, alluding to his 9/13/10 conversation with Lt. Combs, states that "**Upon hearing that, I by passed the grievance process and instead wrote internal affairs** because I was afraid of Correction retaliating." (DE#1 p.7).

The record also shows, and the plaintiff Hurd does not dispute, that he [Hurd] while confined as a MDCJ inmate was aware of and made use of the inmate grievance procedures under DSOP 15-001 for filing written grievances and grievance appeals. (<u>See</u> Defendants' Ex.A, DE#28-1 p.2 ¶3; and <u>See</u> DE#28-1 Exs. A-2, A-3, and A-4, consisting of copies of grievances and grievance appeals filed by Hurd while he was confined as a pretrial detainee in Miami-Dade County custody in 2010 and 2011 [prior to his transfer to the Florida DOC in November 2011].

**V**   <u>**ANALYSIS**</u>

Pursuant to the framework for analysis under <u>Myles</u>, <u>Turner</u>, and <u>Bryant</u>, <u>supra</u>, of the question of whether Plaintiff Hurd fully and properly exhausted his available administrative remedies before bringing suit under §1983 in this court, the Court will first examine and consider the defendants' and plaintiff's versions of the facts, taking the plaintiff's version of the facts as true, and will then, to the extent that there are disputed factual issues related to exhaustion, make specific findings in order to resolve any disputed factual issues.

Upon review of the parties' filings, and construing the fact allegations in the light most favorable to the plaintiff, the following facts/allegations are taken as true. Plaintiff Hurd was a pre-trial detainee at the MDCJ. The County Corrections Department has an inmate grievance procedure (DSOP 15-001) establishing a process for inmates to complain/grieve about various matters, including staff abuse, medical concerns, etc. As discussed <u>supra</u>,

the DSOP 15-001 provides a mechanism for informal resolution of the inmate's concerns, followed by a formal written grievance, to be followed by a written grievance appeal if the inmate does not find the ruling at the written grievance stage to be satisfactory. On August 9, 2010, Hurd, who was in Administrative Confinement, rumored to engage in masturbation in front of female guards, informed Sgt. Durand that he felt stressed, and wanted to see a psychiatrist. She refused, and Hurd cut himself on the shoulder. Corrections staff responded to Hurd's 10th floor cell. Sgt. Durand, accompanied by Sgt. Wilson and Officers Frezin and Carter, took Hurd, who was in wrist restraints, to see medical staff. They escorted Hurd via a staircase, with Wilson and Frezin grasping his arms. While they were on the staircase Durand verbally taunted Hurd [about wanting to masturbate in the presence of female staff, and then crying when placed in confinement as a result], and as Durand thus verbally taunted Hurd she pushed his head several times, while Officer Carter stood near a doorway to the stairs, and Wilson and Frezin had hold of Hurd's arms. Hurd was seen by medical staff, and a psychiatrist instructed Durand to place Hurd in a suicide watch cell on the jail's 9th floor, but she ignored that instruction, stating that Hurd would be placed in a "strip cell" on the 10th floor of the jail facility. Hurd was escorted by the same four officers via the staircase back to the 10th floor, and on the way there he was again subjected to unspecified abuse similar to that which had earlier occurred in the stairway as he was being taken to see medical staff. All of those events occurred on 8/9/10. In September, on 9/9/10, Hurd, again/still under emotional stress, attempted to hang himself in his cell on the 10th floor, and he then was placed on "suicide watch" for 8 days (from 9/9 to 9/17/10) in a 9th floor cell on the psychiatric wing of the jail. On 9/13/10, Hurd's 5th day on suicide watch, Lt. Combs [who was not involved in the events of 8/9/10 about which Hurd complains, and is not a designated as defendant in this case] was on Hurd's unit, and Hurd spoke/complained to Combs about Sgt. Durand having "hit" him, while saying "you want to jack off on officers and get to conf[inment]

and cry." In Hurd's words, Lt. Combs [referring to Hurd's complaint about the head-pushing coupled with verbal abuse by Durand on 8/9/10] responded stating: "You lucky I wasnt up there cause I probably would've beat your ass too." Inmate/plaintiff Hurd states that, upon hearing that comment/response from Lt. Combs on 9/13/10, he made the decision on 9/13/10 that instead of using the established grievance procedure to complain about the abuses he claims he was subjected to on 8/9/10 by Durand, Wilson, Frezin and Carter, he would bypass the grievance procedure and instead write a complaint to Internal Affairs to complain about them.

In sum, taking the above facts as true, and construing them in a light most favorable to the plaintiff, there are four separate offenses which Hurd contends were committed by the defendants Durand, Wilson, Frezin, and Carter, through acts and/or omissions, as discussed above at some length. According to Hurd, the four deprivations, all of which occurred on on 8/9/10, are: (1) He wasn't taken/allowed to see a psychiatrist upon his request, and he then cut himself while housed on the 10th floor; (2) then when being escorted from the 10th floor via a stairway to see a doctor, he was subjected to verbal and physical abuse; (3) he was not placed in a 9th Floor suicide-watch cell as a psychiatrist instructed, but instead was returned via the staircase to the 10th Floor and placed in a "strip cell;" and (4) he was subjected to similar abuse as before while being escorted via the stairway back to the 10th floor]. Hurd did not make use of the established inmate grievance procedure to complain about the alleged deprivations of 8/9/10. Hurd states that some 31 days later, on 9/9/10, he attempted to hang himself, and then was transferred to a 9th floor suicide-watch cell. Then on 9/13/10, some 35 days after the defendants' alleged acts/omissions of 8/9/10, Hurd spoke to Lt. Combs, and upon hearing the Lieutenant's response to the concerns he voiced, Hurd made a decision on 9/13/10 [35 days after 8/9/10] that he would forego use of the grievance procedure and instead complain to Internal Affairs about the deprivations that he allegedly was subjected to by the

named defendants more than a month before. Hurd remained on suicide watch for 8 days, from 9/9 to 9/17/10. Hurd was aware of the established procedure for filing both written inmate grievances and grievance appeals, having availed himself of both processes while confined at the MDCJ. He did not seek leave to file out of time grievances concerning the alleged deprivations of 8/9/10.

While the alleged underlying facts are not disputed, the parties [defendants and plaintiff] disagree as to whether the former MDCJ inmate Hurd should be excused for not pursuing and fully exhausting the administrative remedies established under DSOP 15-001 before bringing suit against the defendants pursuant to §1983.

Plaintiff Hurd argues that he was on suicide watch for 8 days (9/9/10 to 9/17/10), and that during that period he did not "have a chance to file a grievance." He also states that when he spoke to Lt. Combs on 9/13/10 while he was still on suicide watch, Combs' unsympathetic comment to him during their 9/13/10 conversation made him "afraid of correction retaliating," and he states that he then decided that he would "by pass" the grievance process, and instead lodge his complaint against the defendants by writing to Internal Affairs. (See Complaint DE#1, and Response/Objection DE#30).

Based on the plaintiff's statements in his own filings (DE#1 and DE#30) the undersigned finds, as follows.

First, although Hurd contends that the defendants on 8/9/10 subjected him to physical abuse [described by him as pushing his head] and verbal abuse [taunting him about masturbating in female officers' presence and then crying when placed in confinement for that behavior], Hurd neither alleges, nor is there any suggestion of record that any of the four defendants made any threat to dissuade him from making use of the inmate grievance procedure at the jail. There is no allegation that any of the defendants [Durand, Wilson, Frezin or Carter] at the time of the alleged

abuses on 8/9/10, or on any other date, made any statement to Hurd indicating or suggesting that they would retaliate against him if filed a grievance. An expression of general fear on the part of an inmate/plaintiff like Hurd, that defendants might retaliate if he used a grievance procedure to complain, is not enough to make the grievance procedure unavailable, and avoid dismissal for lack of exhaustion. See Ballou v. Barber, No. 7:12-CV-31 (HL), 2012 WL 5932681, at *3 (M.D.Ga., Nov. 6, 2012) (noting, upon granting motion to dismiss for lack of exhaustion, that "Plaintiff has provided only a cursory allegation that Defendants threatened him and, that as a result of the threat, Plaintiff requested that his informal grievance be dismissed," and finding that the allegation that the plaintiff was threatened, "standing alone, do[es] not show that Plaintiff was actually prevented or prohibited from utilizing administrative remedies"); Heard v. Allen, No. 1:09-CV-119 (WLS), 2010 WL 3855235, at *4 (M.D.Ga., Aug.12, 2010)(no indication, beyond plaintiff's unsupported and unsworn assertions, that his access to the grievance processes was prohibited by prison officials, by means of threat or otherwise; Plaintiff must point to specific facts showing that officials prohibited or blocked his use of the grievance process); Howard v. Felton, 5:08-CV-201 (CAR), 2009 WL 331386, at *1-2 (M.D.Ga., Feb.6, 2009) (dismissing case for lack of exhaustion, and in doing so noting: "Plaintiff makes no specific allegations of any retaliatory threats" and "Plaintiff does not claim that Defendant or any other prison official made specific retaliatory threats or state any other grounds supporting his alleged fear of retaliation. He merely makes conclusory and unsupported statements that he feared, for whatever reason, retaliation if he filed an appeal of his prison grievance and that he was 'advised' by someone not to pursue the grievance proce-dure"); Miller v. Tanner, 196 F.3d 1190, 1194 (11 Cir.1999) (Plain-tiff must point to specific facts showing that officials prohibited or blocked his use of the grievance process); Poole v. Rich, 2007 WL 2238831, *3 (S.D.Ga. Aug.1, 2007) ("[T]he exhaustion requirement is not excused merely because a plaintiff alleges that he was

threatened with being beaten if he complained"); see also Garcia v. Glover, 197 Fed. Appx. 866, 867-68 (11 Cir.2006)(affirming dismissal of complaint based on failure to exhaust when the plaintiff alleged that officers "'most likely' would have 'killed' him or 'shipped' him out" if they learned the plaintiff had filed a complaint).

While Hurd was still on the 10th floor of the jail (up until 9/9/10, according to his allegations) he could have initiated the inmate grievance procedure by asking for grievance forms from a staff member, and submitting completed forms as required under DSOP 15-001, but he did not do so.

He indicates that he did not complain to anybody until after he was transferred from the 10th floor to the 9th floor [a move which he says was precipitated by his attempt to hang himself on 9/9/10].

Hurd states that he spoke with Lt. Combs on 9/13/10, and that Combs' response to him during that conversation of 9/13/10 made him "afraid of correction retaliating," and it was then that he decided not to pursue the grievance procedure, but rather "by pass" it and instead file a complaint about the defendants to Internal Affairs. (Complaint, DE#1 p.7; and see Response DE#30). Plaintiff Hurd's indication that it was a statement made to him by Lt. Combs on 9/13/10 that made him feel that "Corrections" would "retaliate" if he pursued a grievance, only serves to underscore a finding that his administrative remedies should be deemed unexhausted. As discussed above, the defendants' alleged acts/omissions (Durand's failure to have Hurd see a psychiatrist; 2 instances of physical abuse involving all defendants; and Durand's failure to put Hurd on suicide watch on the 9th floor) all occurred on 8/9/10. Under the provisions of DSOP 15-001, Hurd must have filed grievances against the defendants within 10 work days of the incidents/situations complained of (within 10 days of 8/9/10). Accordingly, Hurd was required to have filed grievances against the defendants on or

23

before 8/23/10. Because Lt. Combs' statement of 9/13/10, which Hurd claims chilled him from using the grievance procedure, was not made until 21 days after the 8/23/10 grievance deadline, Hurd cannot show that the content of his 9/13/10 conversation with Combs could serve as a basis for failing to meet the 8/23/10 deadline for filing grievances.

Moreover, even when the court takes as true plaintiff's allegation that Lt. Combs on 9/13/10 said to him: "you lucky I wasnt there cause I would've beat your ass too" [when Hurd told him about the head-pushing incident], such a statement by Lt. Combs, without more, does not suffice as a threat of the kind contemplated by the Courts. In Turner v. Burnside, for example, the plaintiff/appellant Willie Turner submitted a formal grievance, but just a few days later, the Warden called him "to security" and told him that if Turner did not "like the way they did things around here he would put" Turner in a van and transfer him so he "would never be able to see [his] family again till [he] got out of the Georgia Prison System." Turner, supra, 541 F.3d at 1081. The Eleventh Circuit in Turner cited cases from the Seventh and Second Circuits in support of its conclusion and holding that it is possible for retaliation or the threat of retaliation to make an inmate's administrative remedies unavailable. Turner, at 1084 (citing Kaba v. Stepp., 458 F.3d 678, 686 (7 Cir. 2006) and Hemphill v. New York, 380 F.3d 680, 688 (2 Cir. 2004). In Kaba, supra, at 684-86 the appellate Court found that exhaustion could be excused where prisoner was threatened with beating for filing grievances and the threat was carried out. In Hemphill, supra, 380 F.3d at 689, the Second Circuit, citing its prior decision in Ziemba v. Wezner, 366 F.3d 161, 162 (2 Cir. 2004), noted that where an inmate was assaulted and threatened to keep him from complaining, the state would be precluded/estopped from asserting the exhaustion defense, where Hemphill argued that Officer Surber told him "he'd better drop it," warned that if he "pursue[d] this any further" Surbuer would bring criminal charges against him, and promised that if

Hemphill sought medical attention, Surber would "know about it and...make your life a living hell throughout this penal system"). Hemphill, supra, at 689. In Ziemba, it was alleged that officials took Ziemba to a shower room, threatened him, intimidated him with dogs, and beat and pepper sprayed him. Ziemba, supra, at 162.

Here, in Hurd's case, there is no allegation or showing that Lt. Combs verbalized any threat to Hurd on 9/13/10 that if he [Hurd] were to file a grievance against officers [Durand, Wilson, Frezin, Carter] regarding the events that had occurred 35 days before on 8/9/10, he [Combs] or others would retaliate for such a use of the grievance procedure in some way that would make Hurd's overall condition worse. See Turner, supra 541 F.3d at 1084 (one of the purposes of administrative remedies is to improve prison conditions without having to file a lawsuit, and "That purpose is thwarted if the prisoner is told that lodging a grievance will result in his overall condition becoming worse instead of better")(citing Woodford, supra, 548 U.S. at 93)); see also Turner, supra, 541 F.3d at 1085 ("We conclude that a prison official's serious threats of substantial retaliation against an inmate for lodging or pursuing in good faith a grievance make the administrative remedy 'unavailable'").

Finally, as noted, supra, the plaintiff Hurd did not at any time after expiration of the time for filing grievances about events that occurred on 8/9/10, seek an extension of the time limitation for filing a grievance, as provided for under DSOP 15-001. He remained as a pretrial detainee in the MDCJ until November 2011, and thus had ample opportunity prior to his transfer from the MDCJ some 14 months after the events of 8/9/10, in which to seek additional time in which to pursue administrative remedies provided for under DSOP 15-001. His failure to do so renders his administrative remedies unexhausted. See Harper v. Jenkin, supra, 179 F.3d at 1312 (rejecting plaintiff's argument that it would be futile for him to file an untimely grievance, and holding that in

the absence of a request by the inmate for leave to file an out of time grievance, his administrative remedies could not be deemed exhausted, because to conclude otherwise would undermine the policy concerns of the PLRA, allow inmates to ignore the §1997e(a) exhaustion requirement, and gain access to federal court); Mason v. FNU Bridger, No. 07-14206, 261 Fed.Appx. 225, 229, 2008 WL 67348, at *2-3 (11 Cir.2008) (although plaintiff alleged grievances were not available to him in lock-down status, he could have filed out-of-time grievance upon a showing of good cause; failure to do so rendered claims unexhausted); see Johnson v. Meadows, 418 F.3d 1152, 1159 (11 Cir.2005) (remanding the case "with directions that the district court dismiss [plaintiff's] action for failure to exhaust administrative remedies" where an inmate filed his administrative grievance out-of-time without good cause).

For the above stated reasons, it is apparent that, as to all defendants, and all claims, the complaint by Tywee Dwayne Hurd is subject to dismissal, for lack of exhaustion of administrative remedies provided under the Miami-Dade County Corrections and Rehabilitation Department's Inmate Complaint/Grievance Process, provided under the department's D.S.O.P. 15-001 (Effective Date August 27, 2007).

## VI   DEFENDANTS' ALTERNATIVE STATED GROUND FOR RELIEF

As discussed supra, the defendants contend, in the alternative to their lack of exhaustion defense, that the use of force claims against the four of them should be dismissed for failure to state a cause of action, because they contend that the use of force alleged was de mimimis and is not claimed to have caused any sort of physical injury. Here, where the PLRA exhaustion requirement is a "precondition" to filing suit, and when raised as an affirmative defense is a "threshold" inquiry that must be resolved before reaching the merits, see Myles, supra, 2012 WL 1368164, at *1-2 ; Higginbottom, supra, 223 F.3d at 1261; Miller, supra, 196 F.3d at

1193, and the record demonstrates that the plaintiff's complaint is subject to dismissal pursuant to §1997e(a) with regards to all claims against all defendants, the Court need not reach a determination on the merits, based on the defendants' alternative ground for partial relief.

## VII   CONCLUSION

It is therefore recommended that: 1) the defendants' joint motion to dismiss (DE#28) be GRANTED, as to all claims against all defendants, on the stated ground that pursuant to 42 U.S.C. §1997e(a), the complaint is subject to dismissal for lack of exhaustion of administrative remedies; and (2) this case be closed.

Objections to this report may be filed with the Chief Judge within fourteen days of receipt of a copy of the report.

Dated: January 24th 2013

_____
UNITED STATES MAGISTRATE JUDGE

cc:  Tywee Dwayne Hurd
     M38544
     Dade Correctional Institution
     Inmate Mail/Parcels
     19000 SW 377th Street
     Florida City, FL 33034

     David Marion Murray
     Miami-Dade County Attorney's Office
     Aviation Division
     Post Office Box 025504
     Miami, FL 33102-5504